FACE TRADING, INC v
DEPARTMENT OF CONSUMER AND INDUSTRY SERVICES

Docket No. 256639. Submitted September 13, 2005, at Detroit. Decided
April 18, 2006, at 9:15 a.m.

F.A.C.E. Trading, Inc. (FACE), brought an action in the Ingham
Circuit Court against the Department of Consumer and Industry
Services, the Liquor Control Commission (LCC), and the Bureau of
State Lottery, seeking a declaratory judgment that its product,
Ad-Tabs, is not an illegal lottery, but constitutes a legal game
promotion under MCL 750.372a, and seeking injunctive relief against
enforcement proceedings against retailers who sell FACE's product.
Ad-Tabs are combinations of cash prize games and coupons for goods
or services that individuals buy from vending machines or retailers,
some of whom are licensed by the LCC. The court, James R. Giddings,
J., granted an injunction against enforcement against the retailers
pending appeal. The Supreme Court denied FACE's application for
leave to appeal that order. 474 Mich 878 (2004). The circuit court
subsequently granted summary disposition for the defendants, con-
cluding that Ad-Tabs are primarily an illegal lottery pursuant to MCL
750.372(1), that the game is not a promotional activity permitted by
MCL 750.372(2) because it is not clearly occasional and ancillary to
the sale of Ad-Tabs, and that Ad-Tabs are not a legal game promo-
tional activities under MCL 750.372a. The plaintiff appealed. The
Court of Appeals, METER, P.J., and GRIFFIN, J. (BORRELLO, J., dissent-
ing), in an unpublished order, entered July 29, 2004, denied FACE's
motion for a stay, thus terminating the injunctive relief.

The Court of Appeals *held*:

1. The circuit court properly refused to impose on the defen-
dants the obligation of establishing their position beyond a rea-
sonable doubt. That standard of proof has historically been re-
served for criminal cases, not civil actions seeking declaratory
judgments, which are binding adjudications of the rights and
status of litigants that are conclusive with regard to the matters
declared in a subsequent action between the parties.

2. The circuit court did not err in determining that the sale of
Ad-Tabs constitutes the promotion or operation of a lottery
proscribed by MCL 750.372(1). A lottery is a gambling game or

method of raising money in which a large number of tickets is sold and the winner is determined by chance. The Ad-Tabs tickets sell for money, there are at least 3,000 in any given game, and the purchaser is taking a chance that the ticket selected will be one of a lesser number of winning tickets.

3. The circuit court did not err when it determined that the fact that tickets are available for free does not make Ad-Tabs a game promotion under MCL 750.372a, that is, a game or contest in which the elements of chance and prize are present but in which the element of consideration is not present. FACE used the games of chance to promote the purchase of items that directly furthered its pecuniary interest. The sale of Ad-Tabs was supported by consideration and cannot be a game promotion.

4. The circuit court did not err in determining that the sale of Ad-Tabs is not a promotional activity permitted under MCL 750.372(2). A lottery or gift enterprise that is conducted as a promotional activity is clearly occasional and ancillary to the primary business of the person conducting it and is calculated to promote a business enterprise or the sale of its products or services, but does not include the payment of money solely for the chance or opportunity to win by purchasing a product or service for substantially more than its fair market value. The Ad-Tabs cash prize game is calculated to promote the sale of Ad-Tabs, not to promote the retailer's business enterprise or the sale of its products or services. FACE's promotional activity is not clearly occasional and ancillary to FACE's primary business, which is the promotion and sale of discount coupons. The sale of Ad-Tabs is not permitted by the statute.

Affirmed.

1. LOTTERIES — PROSCRIPTION — GAME PROMOTIONS EXCEPTION.

Game promotions constitute an exception to the statutory proscription of lotteries where a game or contest has the elements of chance and prize, but the element of consideration is not present (MCL 750.372[1], 750.372a).

2. LOTTERIES — PROSCRIPTION — PROMOTIONAL ACTIVITIES EXCEPTION.

A lottery or gift enterprise that is conducted as a promotional activity that is clearly occasional and ancillary to the primary business of the person conducting it and that is calculated to promote a business enterprise or the sale of its products or services, but does not include the payment of money solely for the chance or opportunity to win by purchasing a product or service

for substantially more than its fair market value, is exempt from the proscription of lotteries (MCL 750.372[1], [2]).

*Dickinson Wright PLLC* (by *James E. Lozier, Jeffery V. Stuckey,* and *Jason J. Paupore*) for the plaintiff.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Melinda A. Leonard,* Assistant Attorney General, for the defendants.

Before: ZAHRA, P.J., CAVANAGH and OWENS, JJ.

ZAHRA, P.J. This case arises from the sale of various merchandising coupons that also feature a game that provides the coupon purchaser the opportunity to win cash instantly. In this declaratory action, defendants maintained that the sale of these coupons was contrary to Michigan's lottery law. The circuit court entered an order granting a motion for summary disposition by defendants Department of Consumer and Industry Services (DCIS), Liquor Control Commission (LCC), and Bureau of State Lottery (BSL) and denying a motion for summary disposition by plaintiff F.A.C.E. Trading, Inc., doing business as FACE Card Promotions (FACE). FACE appeals this order as of right. MCR 7.203(A). The significant issues presented in this case are (1) whether plaintiff was promoting or operating a "lottery" under MCL 750.372; (2) whether plaintiff's conduct amounted to a permissible "game promotion" under MCL 750.372a; and (3) whether plaintiff's conduct was within MCL 750.372(2), an exemption for certain "promotional activity" from the prohibition against lotteries. We conclude that promoting the sale of discount coupons through games of chance constitutes the promotion of a lottery under MCL 750.372 and is not a permissible game promotion under MCL 750.372a. We further conclude that the cash prize game at issue in

this case is not exempted promotional activity under MCL 750.372(2). We affirm the circuit court's order.

### I. BASIC FACTS AND PROCEDURAL HISTORY

### A. AD-TABS

FACE is a Wisconsin corporation that sells and distributes a product called Ad-Tabs. Ad-Tabs are physically similar to "charity game tickets," "commonly referred to as a break open ticket or pull-tab[.]" MCL 432.102(5). Ad-Tabs and pull-tabs basically are cardboard tickets that, on one side, have three to five perforated "tabs" that open to reveal hidden symbols. On the other side of a ticket is a grid with two columns. One column has five to eight rows of various combinations of symbols, and the other column contains dollar amounts that correspond to the symbol combinations. The dollar amounts begin at $1 and, depending on the game, escalate in increments up to $200, $225, $250, $300, or $500. If the once-hidden symbols match the symbol combinations delineated on the other side of the Ad-Tab, the purchaser wins the dollar amount indicated next to the combination.

The feature distinguishing Ad-Tabs from pull-tabs are coupons printed on the face of Ad-Tabs.[1] Ad-Tabs offer several different coupons. One example is an Ad-Tab entitled, "Gas and Groceries," which offers $10 off the retail price of a 24-pack of Campbell's chicken noodle soup or pork and beans. Ad-Tabs may also contain advertisements from retail companies that offer coupons on other companies' products. One such Ad-Tab features the "Gold Creek Trading Company,"

---

[1] On some Ad-Tabs in the circuit court record, FACE prints the discount coupon on the face of the perforated tabs so that it may be torn off and retained before turning in a winning ticket to the retailer.

which offers $5 off a "collectible Zippo lighter," a "genuine Case pocket knife" or a "Chase Authentics Nascar Driver Jacket." Similarly, Ad-Tabs from Marathon and Phillips 66 gas stations offer, with a minimum eight-gallon fill-up, a free cappuccino or a coffee and donut. Some Ad-Tabs, for example, "Sports Spin II," do not offer coupons, but novelties such as "5 Million Dollar bills" that a purchaser can receive for $2 and proof of three purchases from the Sports Spin II Ad-Tab game.

Another feature distinct to Ad-Tabs is that the phrase, "No purchase necessary," is printed somewhere on the ticket. While additional language surrounding this statement may vary slightly on different Ad-Tabs, each refers to the official Ad-Tabs game rules, which provide, in part:

> To enter without a purchase: (a) ask the participating retailer for an official game piece request form and legibly hand print all the information requested on the form; or (b) call 800-603-3223 to request an official game piece request form; or (c) on a sheet of white paper no smaller than 3" by 5", legibly print your name, address, city, state, zip code, age, the name of the promotion for which you are requesting a game piece, and the name and address of the retail establishment at which you will redeem the game piece if it is a winning game piece.

## B. THE SALE OF AD-TABS

FACE pays an outside company to print Ad-Tabs and ship them to FACE, which generally sells them to independent distributors,[2] who in turn sell them to local retailers. Retailers, including convenience stores, bowling alleys, restaurants, and taverns, sell Ad-Tabs to the general public. If a purchaser wins the cash prize game,

---

[2] FACE sometimes sells Ad-Tabs directly to retailers.

the retailer pays the winner. However, if a person participating in the "no purchase necessary" option wins the cash prize game, FACE pays the winner.

Retailers make Ad-Tabs available for sale through mechanical dispensing machines that resemble candy or cigarette vending machines, or retailers directly sell them to purchasers out of a transparent plastic barrel. The front of the vending machine often states, in a large typeface, "Win cash instantly." Many of the vending machines have randomly blinking lights, and some even flash "play" and "win" at three-second intervals. The vending machines accept $1, $5, $10, and $20 denominations, but do not make change.

Retailers purchase Ad-Tabs in sets of approximately 3,000, each ticket costing about ten to 12 cents. Each set of Ad-Tabs has a certain number of winning cash prize games. Along with the set of Ad-Tabs, retailers also receive the Ad-Tabs official rules, a winners list form, two Ad-Tabs "no purchase necessary" forms, and a "compliance/registration form." Retailers must complete this form before selling Ad-Tabs. The form requires, in general, that retailers redeem the cash game prizes, display posters that contain abbreviated game rules and information regarding prizes and odds near where Ad-Tabs are sold, supply customers with "no purchase necessary" entry forms when requested, load Ad-Tabs into the vending machines with the coupon side showing, not intermingle different sets of Ad-Tabs within the machines, and not sell expired Ad-Tabs.

FACE began selling Ads-Tabs to distributors in the state of Michigan on January 31, 2001. Six million Ad-Tabs have been sold in Michigan. FACE estimates its yearly sales of Ad-Tabs in Michigan at 2,067,683. In Michigan, "five [Ad-Tabs tickets] have been provided in

response to requests under the 'no purchase necessary'
free chance to win option . . . ."[3]

---

[3] We note two published cases from separate state courts that have
described Ad-Tabs and the sale of Ad-Tabs. In *Sniezek [and FACE
Trading, Inc., d/b/a FACE Card Promotions] v Colorado Dep't of Revenue*,
113 P3d 1280, 1281 (Colo App, 2005), the court stated the following:

> Ad-Tabs are paper tickets that contain a coupon on one side
> and a cash prize game on the other. A customer purchases an
> Ad-Tab from the machine for one dollar per tab.
>
> The cash prize game contains a combination of symbols that
> are revealed when the purchaser opens the tabs. Various combi-
> nations of symbols result in differing levels of prizes, with the
> prizes ranging from one dollar to five hundred dollars. The
> purchaser of a "winning" Ad-Tab can redeem the ticket for a cash
> prize by presenting it to an employee of the establishment where
> it was purchased. A game piece can also be obtained from F.A.C.E.
> by requesting one via the mail.
>
> The coupons on the reverse side of the Ad-Tab provide a
> discount for merchandise that can be obtained when the customer
> tenders the coupon and the purchase price to F.A.C.E. or another
> merchant. Occasionally, more than one coupon is required to
> purchase the merchandise.

In *FACE Trading, Inc v Carter*, 821 NE2d 38, 39-40 (Ind App, 2005),
the court stated:

> Ad-Tabs are two-sided cardboard cards that have a discount
> coupon on one side and a cash prize game . . . on the other side.
> The game side of the Ad-Tab offers a colorful, thematic legend that
> reveals what combination of symbols will produce the indicated
> cash prizes, which range from one dollar to several hundred
> dollars. The coupon side of the Ad-Tab contains a discount from
> one of several companies, as well as perforated tabs that a
> purchaser pulls up to reveal play symbols corresponding to the
> game. A card's play symbols indicate that a purchaser has won a
> cash prize if they match a prize-winning combination of symbols
> designated on the game side of the Ad-Tab. . . .
>
> \* \* \*
>
> The coupon side of the Ad-Tab also includes, in fine print, a
> disclaimer notifying potential purchasers that no purchase is

C. PROCEDURAL HISTORY

Shortly after retailers began to sell Ad-Tabs in Michigan, the LCC began issuing citations to retailers who held liquor licenses on the basis that the sale of Ad-Tabs constituted unlawful gambling.[4] In response, FACE filed this action, seeking a declaratory judgment that Ad-Tabs were not illegal lotteries and that Ad-Tabs complied with MCL 750.372a, which regulates "game promotions." FACE also filed a motion for a preliminary injunction to stay defendants' enforcement proceedings against retailers, pending disposition of the declaratory action. Following a hearing, the circuit court granted FACE's motion.

Following discovery, FACE and defendants filed cross-motions for summary disposition. The circuit court conducted a hearing on the cross-motions for summary disposition and, on June 3, 2004, issued a written opinion granting summary disposition to defendants. The circuit court rejected FACE's argument that purchasers only pay for coupons when purchasing Ad-Tabs and concluded that the sale of Ad-Tabs constituted a lottery under MCL 750.372(1). The court also concluded that the cash prize game was not permitted

---

necessary for a chance to win a cash prize. If a potential purchaser wants a chance to win a cash prize and not pay for the Ad-Tab card, that person must either call a toll free number or write to FACE and ask for a chance to win a cash prize. Upon receipt of the free entry, FACE provides the individual with the Ad-Tab, however, the discount coupon is voided.

Notably, both cases held the sale of Ad-Tabs unlawful under controlling state statutes.

[4] Under Administrative Rule 436.1013, entitled "Gambling and gambling devices prohibited," "(1) [a liquor] licensee shall not allow unlawful gambling on the licensed premises[and] (2) [a] licensee shall not allow any gambling devices on the licensed premises which are prohibited by the statutes of this state." 1999 AC, R 436.1013(1) and (2).

"promotional activity" under MCL 750.372(2), because Ad-Tabs are primarily a lottery, and the cash prize game is not "clearly occasional and ancillary" to the sale of Ad-Tabs. Last, the court concluded that Ad-Tabs are not a "game promotion" under MCL 750.372a, reiterating that the sale of Ad-Tabs constituted a lottery under MCL 750.372(1).

After the circuit court entered the order from which FACE appealed, FACE filed a motion to "stay judgment and maintain preliminary injunction pending appeal." The circuit court entered an order maintaining the preliminary injunction pending disposition of a motion for stay that FACE had filed with this Court. This Court denied FACE's motion to stay,[5] and our Supreme Court denied FACE's application for leave to appeal this Court's order.[6] Thus, currently, the judgment is not stayed, the preliminary injunction is dissolved, and FACE is not selling Ad-Tabs in Michigan.

## II. ANALYSIS

### A. DEFENDANTS NEED NOT ESTABLISH THEIR POSITION BEYOND A REASONABLE DOUBT

We first address FACE's assertion that defendants must prove beyond a reasonable doubt that the sale of Ad-Tabs constitutes a lottery. The applicable burden of proof presents a question of law that is reviewed de novo on appeal. See *Pickering v Pickering*, 253 Mich App 694, 697; 659 NW2d 649 (2002); *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

---

[5] Unpublished order of the Court of Appeals, entered July 29, 2004 (Docket No. 256639).

[6] 471 Mich 878 (2004). Justices CAVANAGH, KELLY, and MARKMAN "would continue the injunction issued by the trial court until completion of the appeal."

FACE brought this action under MCR 2.605 to prevent the LCC from enforcing 1999 AC, R 436.1013 against FACE's customers who sold Ad-Tabs. MCR 2.605 is contained within chapter 2 of the Michigan Court Rules, entitled "Civil Procedure," and provides, in part, that

> [i]n a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted. [MCR 2.605(A)(1).]

We conclude that the circuit court properly refused to impose on defendants the obligation of establishing their position beyond a reasonable doubt. "The function of a standard of proof . . . is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v Texas*, 441 US 418, 423; 99 S Ct 1804; 60 L Ed 2d 323 (1979), quoting *In Re Winship*, 397 US 358, 370; 90 S Ct 1068; 25 L Ed 2d 368 (1970) (Harlan, J., concurring).

"[T]he 'beyond a reasonable doubt' standard historically has been reserved for criminal cases." *Addington, supra* at 428.

> In a criminal case, . . . the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In the administration of criminal justice, our society imposes almost the entire risk of error upon itself. This is accomplished by requiring under the Due Process Clause that the state prove the guilt of an accused beyond a reasonable doubt. [*Id.* at 423.]

"[The beyond a reasonable doubt] standard of proof . . . is regarded as a critical part of the 'moral force of the criminal law,' and we should hesitate to apply it too broadly or casually in noncriminal cases." *Id.* at 428 (citations omitted).

Although historically limited to criminal cases, whether the "beyond a reasonable doubt" standard is applicable to a particular proceeding turns on the nature of that proceeding. Courts are not bound by labels in determining whether the "beyond a reasonable doubt" standard is required. *Addington, supra* at 426; *In re Petition of Wayne Co Treasurer for Foreclosure,* 265 Mich App 285, 299; 698 NW2d 879 (2005). To do so would place form over substance. *In re Petition of Wayne Co Treasurer, supra*; *Kostyu v Dep't of Treasury,* 170 Mich App 123, 130; 427 NW2d 566 (1988). That is, though a proceeding may be labeled "civil," due process may nonetheless require proof beyond a reasonable doubt if that proceeding is punitive and may result in incarceration against one's will. *Addington, supra* at 423.

We conclude that there is no right requiring the "proof beyond a reasonable doubt" standard be applied in declaratory actions. Declaratory actions are not an exercise of state power in any punitive sense. Rather, the court makes only a declaration of "the rights and other legal relations of an interested party seeking a declaratory judgment[.]" MCR 2.605(A)(1). Also, declaratory actions "can in no sense be equated to a criminal prosecution." *Addington, supra*; compare *Winship, supra* (involving a delinquency proceeding). Rather, declaratory actions are civil in nature and result in a " 'binding adjudication of the rights and status of litigants . . . [that] is conclusive in a subsequent action between the parties as to the matters declared . . . .' "

*Associated Builders & Contractors v Dep't of Consumer & Industry Services Director*, 472 Mich 117, 124; 693 NW2d 374 (2005), quoting Black's Law Dictionary (6th ed). Thus, there is no right to demand the proof "beyond a reasonable doubt" standard in declaratory actions.

Further, in this case, no state power has been exercised against FACE in any sense. As mentioned, FACE sued defendants to prevent the LCC from enforcing Rule 436.1013 against FACE's customers who sold Ad-Tabs. Moreover, because only the rights and status of FACE and defendants are involved, FACE's criminal liability is not implicated. We conclude that due process does not require application of the "beyond a reasonable doubt" standard in this proceeding. Accordingly, we agree with the circuit court that defendants need not prove beyond a reasonable doubt that the sale of Ad-Tabs constitutes a lottery.[7]

---

[7] Though decisions from sister state courts are not binding, *Continental Cablevision of Michigan, Inc v Roseville*, 430 Mich 727, 741 n 16; 425 NW2d 53 (1988), FACE relies heavily on *Tipp-It, Inc v Conboy*, 257 Neb 219; 596 NW2d 304 (1999). In *Tipp-It*, the Nebraska Supreme Court decided the applicable of burden of proof under a statute providing " 'the right to bring an action in the district court for declaratory judgment under the Uniform Declaratory Judgments Act against the appropriate chief law enforcement officer of the city . . . in which the work, material, conduct or live performance is located or is intended to be . . . exhibited, for a judicial determination as to whether or not such work, material, conduct or live performance is obscene.' " *Id.* at 223-224 (citation omitted). Because the statute "was intended to provide plaintiffs with a mechanism to test the obscenity issue in a civil action prior to any exposure to criminal prosecution," the court concluded that "proof beyond a reasonable doubt is the most appropriate standard in civil obscenity cases, instituted pursuant to" the declaratory judgment act. *Id.* at 225, 228.

*Tipp-It* addressed the burden of proof under a statute providing for safe-harbor obscenity adjudications, which involve First Amendment concerns not present in the instant case. Indeed, if these concerns were

## B. THE SALE OF AD-TABS CONSTITUTES THE PROMOTION
## OR OPERATION OF A LOTTERY UNDER MCL 750.372(1)

MCL 750.372(1) provides, in part, that a person shall not "[s]et up or promote within this state any lottery or gift enterprise for money." MCL 750.372(1)(a).[8] FACE argues the sale of Ad-Tabs is not contrary to

present, we note that Michigan law provides for similar adjudications to determine whether certain material is obscene before it is displayed. See MCL 722.682(2) (proof that material is not obscene under the clear and convincing evidence standard is an absolute defense to dissemination of obscene material to minors), and MCL 600.2938(9) (an adjudication of nonobscenity is an absolute defense to a criminal action for distribution of obscene material). Because the instant case does not involve the above statutes or the First Amendment, FACE's reliance on *Tipp-It* is entirely misplaced, and we reject its claim that defendants must prove beyond a reasonable doubt that the sale or distribution of Ad-Tabs constitutes a lottery.

[8] MCL 750.372(1) also prohibits other activities connected with a lottery, providing that a person shall not:

(b) Dispose of any property, real or personal, goods, chattels, merchandise, or valuable thing by the way of lottery or gift enterprise.

(c) Aid, either by printing or writing, or in any way be concerned in the setting up, managing, or drawing of a lottery or gift enterprise.

(d) In a house, shop, or building owned or occupied by him or her or under his or her control, knowingly permit the setting up, managing, or drawing of any lottery or gift enterprise, or knowingly permit the sale of any lottery ticket or share of a ticket, or any other writing, certificate, bill, goods, chattels, merchandise, token, or other device purporting or intended to entitle the holder or bearer or other person to any prize or gift or any share of or interest in any prize or gift to be drawn in any lottery or gift enterprise.

(e) Knowingly allow money or other property to be raffled off in a house, shop, or building owned or occupied by him or her or allow money or other property to be won by throwing or using dice or by any other game or course of chance.

Michigan law because the sale of Ad-Tabs does not constitute the setting up or promotion of a lottery under MCL 750.372(1). We disagree.

" '[O]ur primary task in construing a statute, is to discern and give effect to the intent of the Legislature.' " *Neal v Wilkes*, 470 Mich 661, 665; 685 NW2d 648 (2004), quoting *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). When given their common and ordinary meaning, *Veenstra v Washtenaw Country Club*, 466 Mich 155, 160, 645 NW2d 643 (2002), citing MCL 8.3a, "[t]he words of a statute provide 'the most reliable evidence of its intent,' " *Sun Valley, supra*, quoting *United States v Turkette*, 452 US 576, 593, 101 S Ct 2524, 69 L Ed 2d 246 (1981). Further, we may consult dictionary definitions in such situations. *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004). "If the statutory language is unambiguous, we must presume that the Legislature intended the meaning it clearly expressed and further construction is neither required nor permitted." *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

The word "lottery" is not defined by statute. Thus, resort to a dictionary is appropriate. "Lottery" is commonly defined as "a gambling game or method of raising money in which a large number of tickets are sold and a drawing is held for prizes," "a drawing of lots," and "any happening or process that is or appears to be determined by chance: *Life is a lottery.*" *Random House Webster's College Dictionary* (1997). Applying the dictionary definition of the word "lottery" to the facts presented here, we conclude that the actions taken by FACE amount to the promotion of a lottery. Each Ad-Tabs ticket sells for a sum of money, usually $1. There are at least 3,000 Ad-Tabs tickets in any given

game. The participant purchasing an Ad-Tabs ticket is taking a chance that the ticket he or she selects is one of the fewer than 500 winning Ad-Tabs tickets. Whether the participant selects a winning ticket is purely a matter of chance.

We are not persuaded, as argued by FACE, that our Supreme Court has concluded as a matter of law that a lottery cannot be found unless there is evidence to support a finding of "consideration, prize and chance." *Sproat-Temple Theatre Corp v Colonial Theatrical Enterprise, Inc*, 276 Mich 127, 129; 267 NW 602 (1936); see *People v Wassmus*, 214 Mich 42, 45; 182 NW 66 (1921) ("It is said that the essentials of a lottery are: *First*, consideration; *second*, prize; *third*, chance."); *Glover v Malloska*, 238 Mich 216, 219; 213 NW 107 (1927) ("The often asserted essentials of a lottery, viz.: consideration, prize, and chance, were all present."); *People v Welch*, 269 Mich 449, 452; 257 NW 859 (1934). While consideration, prize, and chance are often common factors found in a lottery, our Supreme Court has noted that the term "lottery" must be construed broadly.

> [T]he word "lottery" must be construed in the popular sense, with the view of remedying the mischief intended to be prevented, and to suppress all evasions for the continuance of the mischief. The word lottery is generic. No sooner is it defined by a court than ingenuity evolves some scheme within the mischief discussed, but not quite within the letter of the definition given. This is made very apparent in the large number of cases which we have examined in which various methods of distributing money or goods by chance are examined and discussed. [*People v McPhee*, 139 Mich 687, 690-691; 103 NW 174 (1905).]

Significantly, our Supreme Court warned against imposing rigorous and formalistic requirements on

what constitutes a lottery. In *McPhee*, the Court observed that courts ought not declare something is not a lottery merely " 'because it lacks some element of a lottery according to some particular dictionary's definition of one, when it has all the other elements, with all the pernicious tendencies, which the State is seeking to prevent.' " *Id.* at 691, quoting *Ballock v Maryland*, 73 Md 1, 7; 20 A 184 (1890). Thus, while the Supreme Court has indicated that the essentials of a lottery generally are consideration, prize, and chance, these essentials cannot be used to frustrate the plain and ordinary meaning of the word "lottery."

### C. GAME PROMOTION UNDER MCL 750.372a

FACE further contends that even if consideration is not an element necessary to a finding that it is promoting a lottery, the sale of Ad-Tabs is a permissible "game promotion" under MCL 750.372a. We disagree.

MCL 750.372a provides:

> (a) For purposes of this section, the term game promotion shall mean any game or contest in which the elements of chance and prize are present but in which the element of consideration is not present.

FACE contends that Ad-Tabs is a "game promotion" because it is a "game or contest in which the elements of chance and prize are present but in which the element of consideration is not present." We reject FACE's formalistic contention that being able to play the cash prize game without purchase allows the sale of Ad-Tabs as a "game promotion." We conclude that the sale of Ad-Tabs was supported by consideration such

that FACE cannot be said to have been running a game promotion under MCL 750.372a.[9]

The seminal case addressing a promotional scheme that offered "free" chances to win a prize is *Glover*, *supra*. In *Glover*, the defendant, a gasoline and oil distributor,

> conceived the idea that it would aid his business of selling gasoline and oils to retail dealers, to have tickets printed and holders thereof a chance to draw an automobile at monthly drawings. [The defendant] procured the tickets, sold the same at a cent each to his customers, and let them give away the tickets at their retail oil stations, or to any one asking for tickets without making a purchase. [*Glover*, *supra* at 217-218.]

The Supreme Court held, under a similar statute prohibiting lotteries,[10] that:

_____

[9] We shall assume without deciding that if FACE's activity amounts to a game promotion under MCL 750.372a, it cannot be a lottery under MCL 750.372. However, we observe that MCL 750.372a expressly limits the application of the definition of "game promotion" to the "purposes of this section." MCL 750.372a(a). The section referred to as "this section" is MCL 750.372a, not MCL 750.372. "Where the language [of a statute] is unambiguous, 'we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written.' " *Pohutski v City of Allen Park*, 465 Mich 675, 683; 641 NW2d 219 (2002), quoting *DiBenedetto v West Shore Hosp*, 461 Mich 394, 402; 605 NW2d 300 (2000). FACE's argument assumes that the definition of "game promotion" in MCL 750.372a applies to MCL 750.372. However, MCL 750.372 is a different section and the express language of MCL 750.372a clearly shows that the Legislature did not intend the definition of "game promotion" under MCL 750.372a to apply to other sections.

[10] 1915 CL 15051 provided:

> Every person who shall sell either for himself or for any other person, or shall offer for sale, or shall have in his possession with intent to sell or offer for sale, or to exchange or negotiate, or shall in any wise aid or assist in the selling, negotiating or disposing of

The often asserted essentials of a lottery, viz. consideration, prize, and chance, were all present. [The defendant] sold the tickets to [retailers] for distribution by them in the course of trade to further his pecuniary interest, and this established consideration. The fact that [the defendant] gave some tickets away at fairs and exhibitions and the purchasers of tickets for use in the retail trade gave them away, without pay, to their customers, and sometimes to others, did not at all save the scheme from being a lottery. There was a prize furnished by [the defendant] at each monthly drawing and paid for, in whole or in part, by [the retailers] in the purchase of tickets to be given out in the course of retail trade. Chance determined the winners at the drawings. [*Id.* at 219.]

Here, just as the defendant in *Glover*, FACE "sold the tickets to [retailers] for distribution by them in the course of trade to further [its] pecuniary interest[.]" *Id.* The game of chance was offered "free" to the purchaser from the retailer, who claimed only to be selling a product, whether gas, oil, or coupons. Likewise, in *Glover* and here, the game of chance did not require product to be purchased because participation was "free" by request. Thus, we conclude that the "no purchase necessary" method of entry does not render the transaction free of consideration.

FACE attempts to distinguish *Glover* by claiming that it involved "indirect" consideration that is not present in this case. The notion of "indirect" consideration stems from the Colonial Theatre cases (*Sproat-Temple, supra,* and *United-Detroit Theaters Corp v Colonial Theatrical Enterprise, Inc,* 280 Mich 425; 273 NW 756 [1937]). In those cases, the theaters gave numbered tickets to their patrons and to those nearby the theaters who requested a ticket. The theaters later

a ticket in any such lottery or gift enterprise, . . . shall be punished . . . .

drew numbers from a lot, and persons holding the matching tickets received prizes. In each case, our Supreme Court indicated that prizes attracted persons to the theaters that otherwise would not have attended. The Supreme Court observed that, " 'while the patrons may not pay, and the [theaters] may not receive any direct consideration, there is an indirect consideration paid and received.' " *Sproat-Temple, supra* at 130 (citation deleted); see also *United-Detroit Theaters Corp, supra* at 429.

In contrast to the Colonial Theatre cases, our Supreme Court in *ACF Wrigley Stores, Inc v Wayne Prosecuting Attorney,* 359 Mich 215; 102 NW2d 545 (1960), held that a television giveaway program was not an illegal lottery. FACE notes that in the Colonial Theatre cases the game under scrutiny "required the participants' presence, either in the theatre or in the immediate vicinity[.]" *Id.* at 223. Conversely, in *ACF Wrigley Stores* the game participants were not required to be present. On the basis of this distinction, FACE maintains that *ACF Wrigley Stores* broadly held that indirect consideration, in the least, requires that participants be present to enter a game of chance. FACE argues that because Ad-Tabs' "no purchase necessary" option does not require participants' presence, there is no indirect consideration.

We find no merit to this argument. In *ACF Wrigley Stores,* the game of chance did not promote the purchase of any item, but only promoted further television viewing. On the other hand, the game of chance in the Colonial Theatre cases, by increasing foot traffic, promoted the purchase of theatre tickets. Our Supreme Court expressly indicated that, in each of the Colonial Theatre cases, the "indirect" consideration resulted in direct financial benefit or profit to the theaters. *Sproat-*

*Temple, supra* at 130; *United-Detroit Theaters Corp, supra* at 429. Here, like the defendants in *Glover* and the Colonial Theatre cases, FACE used games of chance to promote the purchase of items that directly furthered its pecuniary interest.

We conclude the sale of Ad-Tabs was supported by consideration and, therefore, cannot be a game promotion permissible under MCL 750.372a.

### D. PROMOTIONAL ACTIVITY UNDER MCL 750.372(2)

FACE also argues that even if the sale of Ad-Tabs constitutes a lottery under MCL 750.372 and is not a permissible game activity under MCL 750.372a, the sale of Ad-Tabs is nonetheless permitted "promotional activity" under MCL 750.372(2), which provides an express exception to the prohibition of the promotion or operation of a lottery in MCL 750.372(1). MCL 750.372(2) provides:

> Subsection (1) does not apply to a lottery or gift enterprise conducted by a person as a promotional activity that is clearly occasional and ancillary to the primary business of that person. As used in this subsection, "promotional activity" means an activity that is calculated to promote a business enterprise or the sale of its products or services, but does not include a lottery or gift enterprise involving the payment of money solely for the chance or opportunity to win a prize or a lottery or gift enterprise that may be entered by purchasing a product or service for substantially more than its fair market value.

By its express terms, MCL 750.372(2) concerns promotional activity that is "calculated to promote *a* business enterprise or the sale of *its* products or services." (Emphasis added). In regard to which business the cash prize game promotes under MCL 750.372(2), the parties' arguments are ambiguous. For instance, on appeal,

FACE maintains that "the Ad-Tabs® game is calculated to promote the sale of discount coupons." But in response to defendants' motion for summary disposition, FACE maintained that Ad-Tabs "promot[e the] retailer's primary business of the sale of alcoholic beverages, non-alcoholic beverages, and/or food items or to participate in recreational, amusement, or games of skill offered by such Ad-Tabs® retailer." Thus, FACE has maintained, at different times, that Ad-Tabs are calculated to promote both the sale of coupons and the retailer's business.[11]

Because it is not clear which business or which products of a business the cash prize game promotes under MCL 750.372, it also is not clear which business is conducting the "lottery or gift enterprise . . . as a promotional activity." Considering either FACE or the retailer as the person conducting the lottery, we conclude that the cash prize game is not permissible promotional activity.

Considering the retailer as conducting the lottery, the "promotional activity" envisioned under the statute is "an activity that is calculated to promote [the retailer's] business enterprise or the sale of [the retailer's] products or services[.]" MCL 750.372(2). We conclude that there is no evidence in the circuit court record supporting a claim that Ad-Tabs are *"calculated* to promote [the

---

[11] MCL 750.372(2) does not state that the promotional activity is "an activity that is calculated to promote . . . business enterprise[s] or the sale of [the distributor's and retailer's] products or services." "Where the language [of a statute] is unambiguous, 'we presume that the Legislature intended the meaning clearly expressed—no further judicial construction is required or permitted, and the statute must be enforced as written.' " *Pohutski, supra* at 683, quoting *DiBenedetto, supra* at 402. Here, the statute only permits promotional activity that is calculated to promote a single business or the products of the business, not several different businesses or those businesses' products.

retailer's] business enterprise or the sale of its products or services[.]" *Id.* (emphasis added). Rather, the cash prize game is calculated to promote sales of Ad-Tabs coupons. Any promotion of the retailer's "business enterprise or the sale of its products or services" is merely incidental, certainly not calculated. *Id.* This is evidenced by the placement of Ad-Tabs vending machines in unrelated business establishments, including taverns, retail stores, and bowling alleys. The cash prize game is calculated to promote the sale of coupons, not to promote the retailer's "business enterprise or the sale of its products or services."

Considering FACE as conducting the lottery, the "promotional activity" envisioned under the statute is "activity that is calculated to promote [FACE's] business enterprise or the sale of [coupons][.]" MCL 750.372(2). Because the cash prize game is calculated to promote the sale of coupons, FACE engages in "promotional activity." However, FACE's promotional activity is not "clearly occasional and ancillary" to FACE's primary business. FACE's primary business is the promotion and sale of discount coupons. FACE claims that sets of Ad-Tabs expire and are therefore "occasional." While different Ad-Tabs may expire at different times, FACE consistently promotes the sale of discount coupons through games of chance. Accordingly, the "promotional activity" in which FACE engages cannot be considered clearly occasional. Further, for the same reason, FACE's primary business promoting the sale of discount coupons using the games of chance cannot be considered clearly ancillary to FACE's primary business. Therefore, the promotion of Ad-Tabs through games of chance is not a promotional activity contemplated by the statute.

## E. REMAINING ISSUES

Finally, FACE argues that reversal is required on the basis of alleged evidentiary and procedural errors committed by the trial court. Specifically, FACE claims that the circuit court improperly considered affidavits from experts and BSL employees in granting summary disposition in favor of defendants. "Evidence offered in support of or in opposition to the motion [for summary judgment] can be considered only to the extent it is admissible." *Veenstra, supra* at 163, citing MCL 2.116(G)(6) and *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999).

In support of the BSL's motion for summary disposition, the BSL submitted affidavits from a gaming expert witness, Nelson Rose, and expert witnesses from the BSL, Robert Blessing and Michael Peterson. Before the summary disposition hearing, FACE filed separate motions to strike the testimony of the expert witnesses. In each, FACE claimed that the expert witnesses improperly offered ultimate legal conclusions that Ad-Tabs were illegal lotteries.

We conclude that there is no evidence that the circuit court relied on the opinions of any expert witnesses. Although the circuit court did not rule on FACE's motion in limine to exclude the affidavits of the expert witnesses, the circuit court did not admit the affidavits into evidence. The circuit court's June 3, 2004, opinion does not mention the expert witnesses. More importantly, the circuit court's opinion is supported by the applicable statutes and relevant case law. The circuit court cites several lottery cases in support of its decision, including *People v Brundage*, 381 Mich 399, 408; 162 NW2d 659 (1968); *People v Weoch*, 269 Mich 449; 257 NW2d 859 (1934); *Sproat-Temple, supra*; *United-Detroit Theaters Corp, supra*; *Glover, supra*; *McPhee, supra*; *People ex rel Kelley v Koscot Inter-*

*planetary, Inc,* 37 Mich App 447; 195 NW2d 43 (1992); *Midwestern Enterprises Inc v Stenehjem,* 625 NW2d 234 (ND 2001); *GA Carney, Ltd v Brzeczek,* 117 Ill App3d 478; 453 NE2d 756 (1983); *Commonwealth v Wall,* 295 Mass 70; 3 NE2d 28 (1936). The circuit court's opinion relies on either case law or statute, and not on any expert witnesses. Moreover, FACE has not pointed to any aspect of the circuit court's opinion that indicates that the circuit court relied instead on the opinions of the expert witnesses in rendering its decision. Because there is no indication that the circuit court considered affidavits from the expert witnesses in rendering its decision, we cannot conclude that the circuit court committed error.

FACE similarly argues that circuit court erred in granting defendants summary disposition in relying on affidavits submitted by other BSL employees, including Mark Bentley, Jim Curtis, Alicia Nordmann, David Owen, Thomas Reich, and Allyson Woodruff (hereafter "fact witnesses"). Essentially, the fact witnesses visited approximately 80 Michigan retail establishments that sold Ad-Tabs and recorded their observations in regard to the retailers' sale of Ad-Tabs to patrons. These observations were later set forth in affidavits filed in support of defendants' motion for summary disposition.

FACE claims the affidavits were inadmissible because the fact witnesses provided hearsay evidence, in particular, tavern employees' statements that patrons did not purchase Ad-Tabs for the coupons, but only to play the cash prize game. FACE also challenges the reliability of the fact witnesses' "investigations," in which, for instance, the fact witnesses were not able to categorically maintain that Ad-Tabs purchasers did not preserve the coupons independently of the cash prize

game. FACE insists that the circuit court relied on the fact witnesses' affidavits to find that Ad-Tabs coupons were not valuable, which allowed the circuit court to conclude that "the inducement for most coupon purchasers is the game: Buying a coupon is incidental to the overriding motive on the part of most purchasers to win a prize in a game of chance."

Initially, we note that it is not clear that the circuit court relied on the fact witnesses to render the above finding and conclusion. The circuit court apparently relied on its findings that "[r]elatively few people play [the cash prize game] for free," and "most participants are purchasers of coupons," to conclude that "[i]t can be reasonably assumed, on the basis of common sense, that virtually all purchasers play the game and some also redeem the coupons." The circuit court also indicated that "the coupon-redemption rate is low[.]" Though FACE challenges this statement by arguing that its coupon-redemption rate is consistent with the redemption rates of other coupons, FACE fails to posit evidence that those other coupons must be purchased. Given the above statements, we would be inclined to defer to the circuit court's findings and conclusions relative to the inducement of Ad-Tabs purchasers. However, we need not do so here. As discussed, we rely on FACE's admissions that the cash prize game promotes the sale of coupons that furthers FACE's pecuniary interest. Accordingly, we do not consider evidence of the purchasers' motivations in buying Ad-Tabs beyond that the cash prize game promotes sales of Ad-Tabs. Thus, upon review de novo, we conclude that reasonable minds could not differ in regard to whether the cash prize game promotes the sale of Ad-Tabs. *In re Handelsman*, 266 Mich App 433, 439; 702 NW2d 641 (2005); *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468

(2003).[12] Further, this Court " 'will not reverse when the trial court reached the right result for the wrong reason.' " *H A Smith Lumber & Hardware Co v Decina (On Remand)*, 265 Mich App 380; 695 NW2d 347 (2005) (citation omitted). Therefore, regardless of whether the fact witnesses' affidavits would have been admitted and relied on by the circuit court, we conclude that reversal is not required.

### III. CONCLUSION

We conclude that the circuit court properly granted defendants summary disposition. The sale of Ad-Tabs constitutes the promotion of a lottery under MCL 750.372. Further, the sale of Ad-Tabs is not a game promotion under MCL 750.372a and does not constitute permitted "promotional activity" under MCL 750.372(2). Finally, we conclude that FACE's evidentiary and procedural claims of error do not require reversal.

Affirmed.

---

[12] Given that our analysis does not implicate the inducement of the Ad-Tabs purchaser beyond that the cash prize game promotes the sale of coupons, we need not address FACE's claim that the circuit court improperly considered issues of motive and intent. Further, for the same reason, we need not address FACE's claim that the circuit court did not view the Ad-Tabs coupon-redemption rate in the light most favorable to FACE.